## No. 4691.

CHAFFRAIX & AGAR vs. PRICE, HINE & TUPPER. MORTON, BLISS & CO., INTERVENORS.

In the interpretation of commercial contracts, this court will be largely influenced, and guided, by the law merchant of the United States, and the constructions of that law made by the Supreme Court of the United States.

Where a party shares in the profits of a partnership, not as a principal, but as an agent, or employee, who receives a certain proportion of the profits in compensation of his services, he is not a partner.

APPEAL from the Sixth District Court, parish of Orleans. *Saucier, J.*

*T. Gilmore & Sons* and *Lea, Finney & Miller*, for plaintiffs and appellees.

*Breaux, Fenner & Hall*, for defendants.

*Carleton Hunt* and *William H. Hunt*, for intervenors.

The opinion of the court was delivered by

MORGAN, J. On the twenty-eighth of December, 1872, plaintiffs brought this suit against the defendants, Price, Hine & Tupper, alleging that on

the —— day of December they sold to defendants seven hundred and eighty barrels of molasses, for the price of $19,170, payable cash on delivery; that the delivery of the molasses, or a portion thereof, had been made within five days prior to the institution of their suit, and that they have a special lien and privilege on the molasses, and that they fear the defendants will part with or dispose of it pending their suit. They prayed for a sequestration of the molasses; that Price, Hine & Tupper be cited to answer their petition, and that they have judgment against them for $19,170, with special vendor's lien and privilege on the molasses for the payment thereof. The writ issued as prayed for.

On the fourth of January following, and before issue joined, plaintiffs filed a supplemental petition, in which they alleged that, through misapprehension of counsel, it was incorrectly stated that the delivery of the molasses, or a part thereof, had been made "within the last five days," and they averred that none of the molasses in question was ever delivered to the defendants. They allege that in some manner, to them unknown, the defendants, without their (the plaintiffs') knowledge or consent, procured warehouse receipts to be issued by the New Orleans Sugar Shed Company, and by one Rodd, for a considerable portion of the molasses, which had been removed from the levee by the wharfinger of the city because it was there in contravention of city ordinances, and placed in the charge of the said company and the said Rodd, and that as to the remainder of the molasses, for which warehouse receipts were not procured, the defendants took possession thereof without plaintiffs' consent or authority.

On the sixth of January Price, Hine & Tupper answered. They disclaimed any ownership of or interest in the property sequestered. They averred that, long prior to the sequestration, the molasses had been sold and delivered to Morton, Bliss & Co., and by them paid for, through their agents, J. B. Lafitte & Co. They prayed that Morton, Bliss & Co. be notified of these proceedings and cited, and that they, Price, Hine & Tupper, be dismissed.

On the seventh of January Morton, Bliss & Co. intervened. They claim to be the owners of the sequestered molasses, and aver that they were in possession thereof when the sequestration issued, through their agents, J. B. Lafitte & Co.

On the thirty-first of January plaintiffs answered the intervention. In this answer they aver that Price, Hine & Tupper, J. B. Lafitte & Co., and Morton, Bliss & Co. were, at the date of the sale mentioned in their original petition, commercial partners, dealing in molasses on joint account; that the molasses sold by them to Price, Hine & Tupper was for account of this commercial partnership; that Morton, Bliss & Co. are liable, *in solido*, with Price, Hine & Tupper and J. B. Lafitte & Co. toward them for

12

the price thereof; that no delivery of the molasses was ever made by them (plaintiffs). And in this regard they substantially reiterate the allegations contained in their supplemental petition, from which we have already sufficiently drawn. They reconvene on Morton, Bliss & Co., and pray for judgment against them, *in solido*, for the full amount of the purchase price of the molasses.

Were Morton, Bliss & Co. commercial partners of Price, Hine & Tupper in December, 1872, and, as such, responsible for their commercial obligations toward Chaffraix & Agar in regard to the molasses purchased from them?

On the twenty-sixth of October, 1872, J. B. Lafitte & Co. wrote from New Orleans to Morton, Bliss & Co., at New York, the following letter:

"We have been speaking for some months past with Messrs. Price, Hine & Tupper about prime and choice molasses, and we would call your attention to the inclosed letter from their Mr. Tupper.

"Messrs. T. Tupper & Sons (father and brothers of the writer of the inclosed) were for nearly thirty years large receivers of sugar and molasses direct from the plantations of this State, and the writer recollects that Mr. Tupper mentioned, some four or five years since, that he had never known New Orleans molasses bought in December to fail to pay a handsome profit. The only grades to operate on are prime and above, as there is no loss from leakage, and those grades never ferment. The quantity produced of those grades during the two last seasons has been about forty thousand barrels each year. The advance has not been stimulated in any year by any attempt to control prices by buying up largely by one or two parties, but has been the natural result of the course of trade. We think by controlling one-half of the whole product an additional advance might be secured.

"Messrs. Price, Hine & Tupper stand very well in every respect, and are quite familiar with all the details of the business, as they have made sugar and molasses their specialty for a great many years.

"The proposition is to ship part of our purchases to New York, Philadelphia, Baltimore, and Charleston, and hold a part, say one-half, here. They can raise a portion of the amount needed, but as money is stringent here it would be impossible to carry so large a quantity in that way. If you will furnish the capital, we propose to allow you one-half of the profits upon the whole transaction, including the shipments as well as the portion held here. We would, of course, hold the warehouse receipts and keep it fully covered by insurance. The total amount needed would not exceed one hundred and fifty thousand dollars, if so much, and the greater portion would probably be needed for less than thirty days, and the whole transaction would certainly be closed within sixty or ninety days. We have been considering this matter ever since the writer's re-

turn, and we feel fully convinced that it will pay a very handsome profit upon the investment.

"Please inform us as soon as possible if you are disposed to take hold of the matter."

The letter which Lafitte & Co. inclosed to Morton, Bliss & Co. was a letter directed by Tupper to Lafitte & Co., and refers in no manner to Morton, Bliss & Co. It appears, however, from the testimony of Hine, a witness for Morton, Bliss & Co., that negotiations had been pending between all the parties during the summer (Mr. Tupper representing Price, Hine & Tupper) in New York, the negotiations to be consummated by Mr. Lafitte in New Orleans.

To the letter from Lafitte Morton, Bliss & Co. answered by telegraph: "Consult French fully when you see him in regard to proposed molasses operation." French was an agent of Morton, Bliss & Co.

From the testimony of Hine and from the foregoing correspondence it results, we think, that a project had been started between Morton, Bliss & Co., Lafitte & Co., and Price, Hine & Tupper by which the parties were to operate in molasses here, the arrangements to be consummated by Lafitte. Their plans were arranged by Lafitte, as he tells us in his testimony, and the agreement and mode by which it was to be carried out is explained by him as follows:

"Price, Hine & Tupper were to buy the molasses in their own name. We (J. B. Lafitte & Co.) were not to be known in the transaction at all. When they bought the molasses, they were to put it in the sugar-shed in our name or ship it to New York in our name. When they handed us the receipts we were to pay them the money—the approximate amount—as soon as the bills should come in. It was at first expected that when the receipts came in the bills would come in; but of course the bills took a little time to make out, and, as I explained, the cash payments always enabled them to buy to better advantage. Upon giving me the receipts, I gave him the money. It was distinctly understood that I was always to hold the receipts. I explained to Mr. Tupper that Messrs. Morton, Bliss & Co. were willing that we should check on them without any security in their hands, but they always required that we should hold possession of the property before we paid for it. The understanding was that Price, Hine & Tupper were to charge us for the molasses, at the price they paid, and they were to charge in addition all expenses that they paid. They were to charge nothing for their services, but receive one-fourth of the profits as compensation for their services."

The examination then proceeds as follows:

"Question—Your house to receive another quarter, and Morton, Bliss & Co. one-half?"

"Answer—Yes, sir, for furnishing the capital."

"Question—Suppose there had been a loss, Mr. Lafitte, what was the understanding?"

"Answer—Each one should have borne his share, sir."

The agreement between the parties having been thus perfected, operations commenced and large transactions resulted.

It is out of one of the transactions carried on in conformity with this agreement that the present litigation springs. As we have seen Chaffraix & Agar sold to Price, Hine & Tupper seven hundred and eighty barrels molasses. The terms were cash. The price was not paid. Six hundred barrels were sequestered. It is not disputed that the molasses which was sequestered forms part of the molasses sold by Chaffraix & Agar to Price, Hine & Tupper. It was in the possession of Morton, Bliss & Co. when the sequestration issued. Morton, Bliss & Co. claim it as their property. Chaffraix & Agar claim that Morton, Bliss & Co. were the commercial partners of Price, Hine & Tupper, and responsible to them for the entire price of the molasses. They also claim a privilege upon the property.

We see nothing in the agreement or in the course of trade between these parties which made Morton, Bliss & Co. the partners of Price, Hine & Tupper.

Partnership is a contract made between two or more parties for the mutual participation in the profits which may accrue from property, credit, skill, or industry furnished in determined proportions by the parties. C. C. 2801. It is based upon the consent of the contracting parties. Here we see no consent on the part of Morton, Bliss & Co. to enter into a partnership with Price, Hine & Tupper. Their agreement was with J. B. Lafitte & Co. that they were to furnish Lafitte & Co. with the amount of money necessary to purchase a certain quantity and quality of molasses, the molasses to be selected by Price, Hine & Tupper, and to be paid for when the same should have been delivered to Morton, Bliss & Co. Here was no contract whatever between Morton, Bliss & Co. and Price, Hine & Tupper. Chaffraix & Agar sold to Price, Hine & Tupper. They had no dealings with Morton, Bliss & Co. Their property was delivered to Price, Hine & Tupper, and not to Morton, Bliss & Co. Price, Hine & Tupper delivered it to Lafitte & Co. for Morton, Bliss & Co., and received the money therefor. The title passed by delivery from Chaffraix & Agar to Price, Hine & Tupper, and from Price, Hine & Tupper, by delivery, to Morton, Bliss & Co. It was, therefore, Morton, Bliss & Co.'s property when it was sequestered.

But it is further contended that inasmuch as the profits and losses of such purchases of molasses as Price, Hine & Tupper should make were to be divided between Morton, Bliss & Co., Lafitte & Co., and Price, Hine & Tupper, therefore Morton, Bliss & Co. were the partners of Price,

Hine & Tupper, and bound for the debts contracted by them on account of such purchases. The participation in profits and losses is an element of partnership, but it does not, of itself, constitute a partnership in the sense that all the parties to such an agreement are commercial partners, and bound *in solido* each for the debts contracted by the other. If a party comes to me and says: "I think there is money to be made in the purchase of a certain grade of cotton; let me have the money with which to buy it, and we will share the losses or divide the profits;" and I give him the money required, this does not make me his commercial partner. If I give him the money, and he buys the cotton, but does not pay for it, I am not bound in his stead.

And this, it seems to us, is what Morton, Bliss & Co. did. They gave the money to Price, Hine & Tupper to pay for the molasses purchased by them, but they did not give it until the molasses had been put in their possession. And this was in conformity with their agreement. They were in no case to give the money until the property was in their possession and under their exclusive control. After delivery to them, Price Hine & Tupper had no interest in it further than the profit which it might make. This doctrine is well laid down, and the difference between partners and participations in profits, and explained by Bedaride in his treatise Des Sociétés, vol. 2, p. 274. He says:

"D'associé à associé obligation respective de se faire raison de l'achât et de la vente de la marchandise, de partager les bénéfices ou de contribuer à la perte dans les proportions convenues; en conséquence, action pour contraindre à rendre compte, à restituer la part des bénéfices ou à payer la perte. Donc, entre associés, il existait une société réelle et incontestable.

"Des participants aux tiers rien de ce qui résulte d'une société ordinaire. Notamment, absence complète d'obligations, et surtout de solidarité active ou passive. Ainsi le vendeur de la marchandise, ne connaissant que l'acheteur, ne pouvait demander qu'à lui seul le paiement du prix, n'intenter que contre lui toute autre action relative à l'existence, aux conditions du marché, à son exécution. De son côté, l'acheteur, n'ayant à faire qu'à son vendeur, et ne pouvant être actionné que par lui, se libérait valablement entre ses mains.

"En réalité, donc, dans ses rapports avec les tiers la participation ne constituait pas une société. Cette conséquence était surtout due à ce qu'elle n'en avait pas l'apparence. Chaque participant traitant en son nom et personnellement, les tiers ne pouvaient prétendre avoir été induits en erreur, ou avoir compté sur des garanties autres que celles offertes par celui avec qui ils avaient traité."

"*Maxima est differentia, inter socium et participem, et sic diversi in jure producuntur effectus, quorum præcipui sunt ut participes non tene-*

*antur, nisi ad ratam capitalis pro quo participant in negotio. Neque ipsi agere possunt contra debitores societatis, neque conveniri valent a creditoribus."   Casaregis, Dix.* 39, *Nos.* 30, 31, 32.

" *Contra participem nulla datur actio, neque interet regula ut obligatio contracta per socium official consocium. Creditori alia non datur actio, nisi obliqua ex persona propria ac directi debitoris, cujus dicitur legalis procurator, ejus que jura exercere potest, et pro ut ipsi debitori competunt; secus autem si non competat." Luca, Dix.* 88, *Nos.* 4, 11.

And so in the case before us. Chaffraix & Agar sold their property to Price, Hine & Tupper. They did not know Morton, Bliss & Co. in the transaction; they had no dealings with them. The property had been transferred to Morton, Bliss & Co., who had paid their money for it, when it was sequestered. Morton, Bliss & Co. had it in their possession. It was not liable to seizure to pay Price, Hine & Tupper's debt.

It is a very hard case on the plaintiffs, for they have certainly been defrauded out of their property. But it must not be lost sight of that Chaffraix & Agar sold their property for cash, and allowed Price, Hine & Tupper to get possession of it without the cash being paid; that they did not record their privileges against it, and brought no suit to recover it until some eight days had elapsed after the sale. In the meanwhile, it had passed out of the possession of Price, Hine & Tupper, into the possession of Morton, Bliss & Co., who paid their money for it. Chaffraix & Agar can only recover now from Morton, Bliss & Co. upon the ground that they were commercial partners of Price, Hine & Tupper, and this, we think, they were not.

It is therefore ordered, adjudged, and decreed that, as regards Morton, Bliss & Co., the judgment of the district court be avoided, annulled, and reversed, and that there be judgment in their favor, and that the sequestration herein issued be set aside.

---

### CONCURRING OPINION.

LUDELING, C. J. It appears J. B. Lafitte & Co. proposed to Morton, Bliss & Co. that if they would advance the money certain qualities of molasses could be bought to advantage; that Price, Hine & Tupper, experienced merchants, engaged in the business, could buy the molasses wanted, if the money was advanced, and *that the money should be paid when the delivery of the molasses was made to Lafitte & Co.* This seems to have been accepted by Morton, Bliss & Co., who furnished the money needed. To induce Price, Hine & Tupper to furnish the molasses, Lafitte & Co. agreed to give them one-quarter of the net profits over the price paid by Price, Hine & Tupper, and to advance the money, to be

procured from Morton, Bliss & Co. The understanding and agreement of Morton, Bliss & Co. was that the transactions should *be for cash—their money was not to be paid until the molasses was delivered to their agents, Lafitte & Co.,* and it did not concern them from whom they purchased or on what terms. The molasses in this case was bought from Chaffraix & Agar, nominally for cash, but without requiring payment down; and it was subsequently delivered to Lafitte & Co. for Morton, Bliss & Co., *who paid the price to Price, Hine & Tupper.* I do not deem it necessary to decide whether there was or was not a second sale from Price, Hine & Tupper to Morton, Bliss & Co. It is certain Chaffraix & Agar sold to Price, Hine & Tupper, and that they, for and in consideration of the amount agreed to be paid by them, and received by them from Lafitte & Co. for Morton, Bliss & Co., transferred and delivered to the latter the molasses, with complete control over it, subject only to the contingent interest in the profits above mentioned. Price, Hine & Tupper were not the agents of Morton, Bliss & Co. The agreement was that when they should acquire molasses and deliver the same to the agents of Morton, Bliss & Co. the price paid, or agreed to be paid by them, should be given them by Morton, Bliss & Co., and that Price, Hine & Tupper should be entitled to one-fourth of the net profits.

I do not think this constituted either a partnership or an agency. Chaffraix & Agar claimed a privilege on the molasses for the price; their claim was not recorded, and as to third parties never had any effect.

I therefore concur in the decree rendered in this case.

---

### DISSENTING OPINIONS.

HOWELL, J. Morton, Bliss & Co. were, in my opinion, either partners in the adventure, or Price, Hine & Tupper were their agents in making the purchase, and in either contingency Morton, Bliss & Co. are liable for the price of the molasses.

There is no evidence, as I understand it, of more than one sale—that made by plaintiffs to Price, Hine & Tupper. By virtue of that sale only the molasses passed to the possession of Morton, Bliss & Co., and in their possession, it is conceded, the property was sequestered.

Under such circumstances I think there can be no doubt that Morton, Bliss & Co., as well as the other parties, are liable to plaintiffs, who should be paid.

I therefore dissent.

WYLY, J. The facts and law of this case are correctly stated in the written opinion of the learned judge *a quo,* which I adopt as my dissenting opinion in this case. I will, besides, add a few observations. Un-

doubtedly there was a partnership between Morton, Bliss & Co. and J. B. Lafitte & Co. in the molasses speculation which they began in November, 1872, and which embraces the lot of molasses the price of which is now in controversy. Undoubtedly there was but one sale of the molasses in question, and Chaffraix & Agar were the vendors, who have not been paid. Undoubtedly they have a privilege upon the thing sold, without registry, provided the vendees have not sold and disposed of the same.

Now, the question arises, for whom was the purchase made by Price, Hine & Tupper? If it was made for the partnership between Morton, Bliss & Co. and John B. Lafitte & Co., and in their behalf, the vendors, Chaffraix & Agar, can certainly sequester the molasses and enforce the privilege for the price, whether they knew or not, at the time of the sale, that Price, Hine & Tupper were buying for said partnership.

That Price, Hine & Tupper bought this lot of molasses, as they had bought many lots before, for the partnership between Morton, Bliss & Co. and John B. Lafitte & Co., and were acting in their behalf, there can be no doubt. They were but fulfilling the agreement they had made with these parties, and in return for the value of their services in making the purchases it is proved they (Price, Hine & Tupper) were to receive one-fourth of the net profits of the speculation when all the shipments were finally sold by Morton, Bliss & Co.

Here the real purchaser, the partnership engaged in this molasses speculation, holds the thing sold and refuses to pay the price. It avails itself of the contract made by Price, Hine & Tupper to get possession of the property, and it repudiates the contract, or that part thereof imposing the duty to pay the price. It is no excuse that Price, Hine & Tupper, the employees of the partnership to buy the molasses, diverted the money intrusted to them and did not pay to plaintiffs the price of the molasses in question.

The partnership was contracted with the express understanding that Price, Hine & Tupper were to do the buying for it in their own name, for fear if it were known in the market that the wealthy firms of Morton, Bliss & Co. and John B. Lafitte & Co. were making these purchases of molasses to be shipped to New York on speculation the price of molasses would enhance, to their disadvantage.

Now, the instrument that the partnership chose to carry out its designs has failed to keep the plighted faith; it, the firm of Price, Hine & Tupper, has violated the agreement; it has wrongfully appropriated the money which it received and which it should have paid over to plaintiffs as the price of the molasses.

It seems to me if the partnership has been disappointed by the wrongful act of its employee, who has diverted its money and not paid the

price, the loss should fall on itself, and not on Chaffraix & Agar.   Certainly the vendee, the partnership, can not keep the molasses which it bought through Price, Hine & Tupper, and not pay the price.   It can not hold up one part of the contract and say it is good and gives a title, and repudiate the other in regard to the payment of the price.   Had the partnership engaged in this molasses speculation shown that Price, Hine & Tupper were not engaged in their employment in buying molasses, and that it bought the molasses in question from Price, Hine & Tupper just as it would from any other seller, of course the demand of plaintiffs in this case could not be maintained.   But the record shows beyond doubt that the partnership was organized for the purpose of buying molasses on speculation, through Price, Hine & Tupper, and in the name of Price, Hine & Tupper.   An important part of the contract was that all purchases made by the partnership should be in the name of Price, Hine & Tupper, for fear if it were known who the real purchaser was the price of molasses would go up.   Viewing the contract out of which the partnership in question arose as an entirety, and considering the whole scope of the intentions and purposes of the parties, there can be no doubt that the molasses was purchased by the partnership, through Price, Hine & Tupper as parties interposed, and that there was in no sense a sale or conveyance from Price, Hine & Tupper to said partnership.

I therefore dissent in this case.

## On Rehearing.

The opinion of the court was delivered by

Manning, C. J.   This cause has been argued before us with great elaboration, with signal ability, and at exceptional length, and the numerous and exhaustive briefs filed by the counsel in this and other suits involving the same issues attest the importance of the principles of law now to be determined.

The statement of the facts and the transcription of the letter of J. B. Lafitte & Co. to the intervenors will appear in the opinion of the court read on the rendition of the judgment the rehearing of which was granted by our predecessors, and need not here be repeated.

If the agreement made by the three firms, conformably to the proposition of Lafitte & Co.'s letter and in accordance with its provisions, constituted a partnership, then the plaintiffs must have judgment against the intervenors for the amount of their demand.   Otherwise, not.

It can not be denied that the question is not free from obscurity.   A list of decisions of unexampled length and completeness has been re-

ferred to by the counsel of both parties, the plaintiffs and intervenors, and there is not only disagreement and conflict of authority upon the points involved, but a great dissimilarity of views among judges as to the signification to be applied to the language used by contracting parties. The distinction of Lord Eldon between a proportion of the profits and a sum equal to a given quantum of the profits, as affording the criterion of determining the question of partnership *vel non*, is too fanciful for practical use, but does not want supporters since his time.

There can be no dispute about the definition of a partnership under our law. The Code tells us that it is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill, or industry furnished in determined proportions by the parties. Civil Code, article 2772, new No. 2801. But there must be disputes, as frequent as the varying engagements of men in active business, as to whether particular contracts fall within that definition, and that is the gist of the present controversy. Price, Hine & Tupper were to buy molasses in their own name, and when they handed J. B. Lafitte & Co. the receipts the latter handed them the money, and the money was furnished by Morton, Bliss & Co. The Price firm were to charge the Lafitte firm for the molasses at the price they paid, with the addition of all expenses paid by them, but were to charge nothing for their services. The Price firm were to receive one-fourth of the profits, the Lafitte firm a like quantum, Morton, Bliss & Co. one-half. The plaintiffs insist that this agreement made the three firms *ipso facto* a commercial partnership. The intervenor denies that the agreement can be thus interpreted, and contends that it is a commercial adventure on joint account, of common occurrence in the centres of commerce, recognized by the laws of all countries, and likened to the *associations en participation* of France.

It is useful to consult the adjudications of courts of other countries, and particularly on questions of commercial law. It is true, as the plaintiff says, that the law of Louisiana must determine this controversy, but decisions of courts, as interpreting the language of commercial men in their transactions, must carry great weight.

The doctrine of Waugh vs. Carver, that a participation in the profits of a business does, of itself and by operation of law, constitute a partnership, and makes all participators liable to third persons, has been the fruitful source of discussion through all the succeeding cases. 2 H. Bl. 235. Its authority is now overthrown. The editor of a late edition of Story on Partnership declares that after being disapproved by all text writers, reluctantly followed by courts, and broken in upon by subtle exceptions and limitations, the doctrine of that case has been finally overthrown in England. Sixth edit. sec. 49, note 2, by Gray. And another

commentator on the same subject, after reviewing this case and others on similar points, concludes that the rule of Waugh vs. Carver is not established by the mass of either English or American authorities. Parsons on Partnership, 71, note 1.

It is to the later decisions of the English courts that we must look for the law of the present day. In 1860 it was held in Nicholson vs. Ricketts, sec. 105, Eng. Com. Law Reports, 496, 2 Ellis and Ellis, Q. B., that the transactions of the parties, although a partnership was created by them, did not bind the defendants. The case was this: The defendants, carrying on business as merchants in London, entered into a contract with Von Seutter & Co., merchants at Buenos Ayres, for the purpose of transacting exchange operations, the substance of which was that Von Seutter & Co. should periodically draw and sell at Buenos Ayres bills on the defendants, to be accepted by them, and should periodically remit other bills to the defendants to the same amount, to keep the defendants out of cash advanced; that the proceeds of these operations should be applied to the common purposes of the two firms, and that there should be a community of profit and loss between them. In the course of these transactions, Von Seutter & Co. drew certain bills on the defendants and sold them to the plaintiffs. The defendants refused to accept these bills when presented to them in London, and the plaintiffs thereupon brought the action against them, on the ground that the agreement and the community of profit and loss constituted the defendants partners with Von Seutter & Co., and so rendered them liable. Held—that the plaintiffs had no cause of action against the defendants. Lord Chief Justice Cockburn placed the decision on the ground of want of authority in Von Seutter & Co. to draw the bills, saying: " In ordinary cases of commercial partnership there is no need of express authority. * * In partnerships not strictly commercial, if it is obvious from the nature of the partnership, or from the particular purposes to which the bills are to be applied, that the drawing of bills is essential, there also the law implies an authority to each partner to draw them. But here there being no express authority to Von Seutter & Co. to draw so as to bind the defendants, but, on the contrary, an arrangement that the one firm should draw and the other accept, and that each should be bound so far only as their own signature was concerned, it seems to me no authority can be implied. The existence and the purposes of the partnership were unknown to the world. The principle therefore that where a partnership for particular purposes is held out to the world as existing, and it is reasonable to consider that drawing of bills is incidental to those purposes, one partner has an implied authority to bind the others by drawing bills, is here inapplicable."

It is assumed or admitted throughout the judgment then rendered

that a partnership was constituted under the circumstances stated, but the right of the Buenos Ayres member to bind the London member by drawing the bill was denied. It is apparent from this decision that when a partnership is created by operation of law, consequent upon a stipulation of participation in profits, it does not necessarily follow that the partners are unqualifiedly bound in the same manner and to the same extent as ordinary commercial partners.

Armstrong vs. Stokes, 7 Law Reports 598, Queen's Bench, is the latest expression (1872) of English judicial opinion upon the extent of the liability of parties under contracts similar to that under review. J. & O. Ryder & Co. were commission merchants at Manchester, carrying on business sometimes for themselves, and sometimes acting in pursuance of orders from their constituents. Plaintiff was a merchant at same place. On the fifteenth of June, 1871, plaintiff's salesman made a contract with Ryders' salesman for shirtings to be paid for thirty days after delivery. The goods were delivered on the twenty-fourth of July, and payment was therefore due on the twenty-third of August, but it was not made, and on the thirtieth of that month Ryders' house stopped payment. It was not pretended that the plaintiff knew before the thirtieth of August that the defendants had anything to do with the transaction, so as to afford evidence on the one hand that he had originally parted with the goods on the credit of the defendants, or on the other hand that he had elected to give credit to Ryders to the exclusion of defendants. But after the stoppage of J. & O. Ryder & Co. it was discovered from their books that in this case they had been acting as commission merchants for the defendants, and the plaintiff's case was that under the circumstances he was entitled to demand payment from the defendants as being undisclosed principals of the Ryders in the transaction. The evidence as to this was that the defendants are merchants at Liverpool, who had often before given orders to J. & O. Ryder for shirtings. There was no running account between the defendants and Ryders, but the defendants almost invariably paid cash on each transaction. The goods ordered in this case were sent on by Ryders on the second of August, with invoice containing the charges of the actual money that ought to have been paid to plaintiffs as the price of the goods, and of commissions, and on the eleventh of August, which was the first pay-day after the goods were received at Liverpool, the defendants with perfect *bona fides* paid Ryders the full sum.

Mr. Justice Blackburn in rendering judgment discussed several of the cases to which the brief of plaintiff's counsel has referred us, and reviews at unusual length the dicta of various judges in them, and thus sums up: "We think that if the rigid rule thus laid down were to be applied to those who were only discovered to be principals after they had fairly

paid the price to those whom the vendor believed to be the principals, and to whom alone the vendor gave credit, it would produce intolerable hardship. It may be said, perhaps truly, this is the consequence of that which might originally have been a mistake, in allowing the vendor to have recourse at all against one to whom he never gave credit, and that we ought not to establish an illogical exception in order to cure a fault in a rule. But we find an exception (more or less extensively expressed) always mentioned in the very cases that lay down the rule, and without deciding anything as to the case of a broker, who avowedly acts for a principal, and confining ourselves to the present case, which is one in which, to borrow Lord Tenterden's phrase in Thompson vs. Davenport, the plaintiff sold the goods to Ryder & Co., 'supposing at the time of the contract he was dealing with a principal,' we think such an exception is established. * * * We confine our decision to the case where the defendants, after the contract was made, and in consequence of it, *bona fide* and without moral blame, paid J. & O. Ryder, at a time when the plaintiff still gave credit to J. & O. Ryder, and knew of no one else. We think after that it was too late for the plaintiff to come upon the defendants."

But the conspicuous and special feature of the opinion, and the practically useful one to us just now, is the demonstration that the courts have all along imputed a controlling influence to the fact of payment by the undisclosed principal to his agent, the actual purchaser, before the seller knew there was any one interested in the transaction but himself and his vendee. As early as 1804 the doctrine urged upon our acceptance by plaintiffs' counsel was so far modified that Lord Mansfield held, if the undisclosed principal had really paid the actual purchaser he would not be liable to pay over again, if it would have been unfair to make him do so. The dictum of Lord Ellenborough in Kymer vs. Suwercropp, 1 Camp. 109, relied on by plaintiffs in their brief, is explained by the fact that the persons employed were brokers, who always have a principal, and the vendor knows in that case there is or ought to be a principal between whom and himself is established a privity of contract, and the principal also knows that the vendor is aware of this, and to some extent trusts his liability. Lord Tenterden in a later case (Thompson vs. Davenport, 9 B. and C. 86-8) said: " I take it to be a general rule that if a person sells goods, supposing that at the time of the contract he is dealing with a principal, but afterward discovers that the person with whom he has been dealing is not the principal in the transaction, but agent for a third person, he may recover the amount from the real principal, subject, however, to this qualification, that the state of account between his principal and his agent is not altered to the prejudice of the principal."

And Maule, J., in a yet later case refers to these dicta of the judges approvingly, saying they afford a sensible rule on the subject.    Making the application to the case before us, there is no dispute as to the fact that Morton, Bliss & Co., through J. B. Lafitte & Co., had paid Price, Hine & Tupper for the molasses sold to the latter by the plaintiffs the instant of delivery, and to make them pay over again would produce the intolerable hardship described and deprecated in the opinion from which we have been quoting.

We are warned by the earnest words addressed to our predecessors by the plaintiffs' counsel when a rehearing was prayed, of the fateful consequences that will attend or follow the enunciation of this doctrine :

"If this be the law, we may expect that all large and wealthy speculators will hereafter make their purchases through some irresponsible party.    In all large commercial operations involving risk and responsibility capitalists will never be known as parties concerned.    By screening themselves behind some irresponsible name they take the profit, if any, and avoid all liability in case of loss."

The eminent judge who rendered the decision last quoted is too acute not to have foreseen such consequences if they would necessarily follow from the doctrine thus formally recognized.    His country is pre-eminently a commercial one.    His comprehensive learning and large experience pointed him out as one of the two judges who have in the last year been elevated to the peerage under a change in the English constitution, made on that occasion, and expressly in order to obtain his judicial assistance in the hearing of cases before the House of Lords.

Lord Blackburn thus opens to our view other inconveniences which would follow the approval of the doctrine maintained by plaintiffs' counsel:  "The great inconvenience that would result if there were privity of contract established between the foreign constituents of a commission merchant and the home suppliers of the goods has led to a course of business in consequence of which it has long been settled that a foreign constituent does not give the commission merchant any authority to pledge his credit to those from whom the commissioner buys them by his order and on his account.    It is true that this was originally (and in strictness perhaps still is) a question of fact, but the inconvenience of holding that privity of contract was established between a Liverpool merchant and the grower of every bale of cotton which is forwarded to him in consequence of his order to a commission merchant at New Orleans is so obvious and well known that we are justified in treating it as matter of law, and saying that in the absence of an express authority to that effect the commission merchant can not pledge his foreign constituent's credit."    Law Rep., 7 Q. B., p. 605.

There is less ambiguity in the French authorities than in the English,

but there are textual provisions in the Code of Commerce of France (Code de Com., articles 47 to 50) that expressly legalize and define *associations en participation*, or commercial adventures on joint account. Savary thus defines them:

"Elle s'appelle ainsi parcequ'elle est sans nom, et qu'elle n'est connue de personne, comme n'important en façon quelconque au public; tout ce qui se fait en la négociation, tant en l'achât qu'en la vente des marchandises, ne regarde que les associés chacun en droit soi; de sorte que celui des associés qui achète est celui qui oblige et qui paye au vendeur; celui qui vend reçoit de l'acheteur : ils ne s'obligent point tous deux ensemble envers une tierce personne; il n'y a que celui qui agit qui est le seul obligé; ils le sont seulement réciproquement l'un envers l'autre en ce qui concerne cette société."

Pothier's definition is more concise: "Celle par laquelle deux ou plusieurs personnes conviennent d'être de part dans une certaine négociation qui sera faite par l'une d'entre elles en son nom seul." Contrat de Société, p. 61. Pardessus explains the difference between partnerships and these associations: "La différence entre les sociétés et entre les associations est importante relativement aux actions des tiers. S'ils font la preuve d'une société collective, les engagements contractés par l'un des associés obligent solidairement les autres, puisque nous avons vu que le défaut d'acte social ou de publicité donnée à ses clauses ne pouvait être opposé aux tiers." Droit Commercial, tome 4, No. 1047. Massé sums up his discussion by saying: "Or, si l'on consulte les anciens auteurs, tant de l'école italienne que de l'école française, on les trouve tous unanimes sur ce point, que l'association en participation ne constitue pas un corps moral dans lequel se confondrait la personne des participants." Droit Commercial, tome 3, p. 483.

Rivière's definition is concise, and perfectly describes a commercial adventure on joint account: "Elle a toujours pour objet une entreprise particulière * * l'opération terminée, la société est dissoute." Répétitions Écrites sur le Code de Commerce, 125. It is true, these jurisconsults are treating of an association legalized by the commercial code of their country, but that code only defined and formulated a contract which had long been recognized by the *lex mercatoria* common to all countries, and hence their commentaries upon such a contract or agreement for an adventure are not inutile in enabling us to understand the nature, effect, and attributes of such an agreement.

It is conceded, however, that neither English nor French authorities will warrant us in construing an agreement by their rules, if our own law, as interpreted by our own courts, imposes a different rule. In Millaudon's case, this court settled conclusively that the laws and usages of commerce to which reference is to be had by our tribunals in interpreting

commercial contracts are those sanctioned by the law merchant of the United States, and explained and adjudicated by the Supreme Court. McDonald vs. Millaudon, 5 La. 403. That court held the following language in discussing the principles and extent of the English decisions in Grace vs. Smith and Waugh vs. Carver: " Actual partnership, as between a creditor and the dormant partner, is considered by the law to subsist where there has been a participation in the profits. * * * That rule, however, has no application whatever to a case of service or special agency where the employee has no power as a partner in the firm and no interest in the profits as property, but is simply employed as a servant or special agent, and is to receive a given sum out of the profits, or a proportion of the same, as a compensation for his services." Berthold vs. Goldsmith, 24 How. 542. And in that opinion the court quote with approbation the case of Hallet vs. Desban, decided by this court, and say that the facts of different cases approach so near to each other that the difference between them is apparently unsubstantial, but a distinction does exist, and the only difficulty is in the application of the principle on which that distinction rests.

The same question came before that court later, when it was insisted that the contract under review made the parties copartners. The language of the court upon that point was imperative and incisive, and excludes the idea of doubt: " We can not adopt that view of the subject. The adjudications which bear upon it are conflicting and irreconcilable. The case of Berthold vs. Goldsmith is conclusive in this forum against the proposition." Seymour vs. Freer, 8 Wal. 215.

We are asked to review the decisions of this court, and the counsel for plaintiffs equally with the counsel for the intervenors insist that its decisions upon the question of partnership are favorable to the views advocated by each. The review thus desired has already been made in the case quoted, by the Supreme Court of the United States. The two opinions rendered then, and published in the Fourteenth Annual, discuss, analyze, and dissect all the previous cases from the Millaudon case down to the date of that judgment (Hallet vs. Desban, 14 An. 529), and the court, after a full and exhaustive study and presentation of the question in all its aspects, as affected by the textual provisions of our Code, by the decisions of our court upon them, and by the decisions of courts of sister States and of the United States upon the question of commercial law involved, decided definitively that a community of profits is the criterion by which to determine the contract of partnership ; but to render a party liable as a partner, he must share as principal, and not as mere agent, factor, or servant.

We have been referred to Leggett vs. Hyde, 58 N. Y. Rep. 272, decided in New York, and Brigham vs. Clark, 100 Mass. 430, in Massachusetts,

Chaffraix & Agar vs. Price, Hine & Tupper.

as confirmatory of plaintiffs' construction of the agreement in this case. The agreement in the latter case is wholly unlike the present, and the ruling can not be considered applicable, but the New-York court distinctly affirms that the rule in Grace vs. Smith and Waugh vs. Carver has been exploded in England, simply because Parliament interfered and changed the law since the law as laid down in those cases was found objectionable, and hence we must be governed by it here (N. Y.) until the Legislature shall see fit to abrogate it as it did in England. But in a previous part of the same opinion the learned judge who was the organ of the court informs us that there has been and is a legislative and practical recognition of the doctrine of Waugh vs. Carver, as a rule of commercial law, in the State of New York, in the limited partnership act. And so, there being statutory provision for the retention and consecration of this rule there, it is not surprising that the rule is adhered to by that court.

Indeed, as you advance in the examination of this question, and trace its history and development in the various decisions of the courts, it will be seen that in the effort to escape the manifest wrong that would be inflicted by applying inflexibly the rule that any participation in the profits necessarily creates a partnership the courts encroached on that doctrine stealthily, and permitted the circumstances of each case to control the rule. The effort to apply the rule without qualification was gradually abandoned, and then arose conflicting dicta which have introduced more perplexity and confusion in the treatment of this question than any other known to the commercial law. It is not too much to say that a superabundance of authorities is accessible to the disputant for either proposition, and that the distinction finally drawn by the judges from the circumstances of the cases before them will sometimes exhibit a court in apparent contradiction to itself upon the application of the rule to those circumstances.

The general principles we educe from this discussion, and which we consider control the present case, are, that a community of interest is the basis of every partnership; but it is not correct to say that every community of interest necessarily constitutes the relation of partnership. Participation in the profits will ordinarily establish the existence of a partnership, in the absence of all other opposing circumstances, between the participators in favor of third persons, but does not necessarily produce that effect. The fact that there is participation is presumptive proof that there is a partnership, but, like all presumptions, is liable to be overcome by circumstances. The rule does not outweigh or overcome or demolish the circumstances, but the circumstances control the rule, and can repel the presumption created by it. The foundation of the rule is manifestly artificial. In adjusting it to the circumstances of

13

each case you do not dislocate any part of the legal edifice erected upon it, but adapt each of them to the other so as to produce symmetry. The circumstances of each case must guide the court, and if in considering them the participation in the profits is clearly shown to be in the character of an agent or employee, the presumption of partnership is repelled.

In the case before us, the Price firm were to use their skill in purchasing the molasses advantageously, and no money was to be paid and no money was paid to them until the molasses was delivered to the Lafitte firm, who received it for Morton, Bliss & Co. and paid Morton, Bliss & Co.'s money for it. This shows the nature of the employment. In our opinion, when Lafitte & Co. received the molasses, and paid for it, it became the property of Morton, Bliss & Co., and the plaintiffs could have recourse upon no one for its price but their vendees, to whom they sold for cash, and of their own accord waived a rigid compliance by their vendees with the conditions of sale. They must bear the consequences of their own act. They gave credit to the Price firm alone. Their recourse is upon it alone.

It is therefore ordered and decreed that the judgment and decree of this court heretofore rendered remain unaltered.